**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RONALD B. SMITH,**

                                **Plaintiff,**          **1:03-CV-1157**
                                                        **(NAM/DRH)**
        **v.**

**CITY OF ALBANY, ROBERT C. FOREZZI, SR.,**
**HENRY J. ABRIEL, and DITONNO & SONS**
**DEMOLITION,**

                                **Defendants.**
_____

APPEARANCES:                                            OF COUNSEL:

COOPER ERVING & SAVAGE, L.L.P.                          Brian W. Matula, Esq.
_Counsel for Plaintiff_
39 North Pearl Street
Albany, New York 12207-2797

JOHN J. REILLY
CORPORATION COUNSEL, CITY OF ALBANY                     Joseph G. McCann, Esq.
_Counsel for Defendants Forezzi, Abriel & City of Albany_   Asst. Corporation Counsel
City Hall
Albany, New York 12207

SMITH SOVIK KENDRICK & SUGNET, P.C.                     Jennifer L. Ploetz, Esq.
_Counsel for Defendant Ditonno & Sons Demolition_
250 South Clinton Street
Syracuse, New York 13202

NORMAN A. MORDUE, D. J.:

### MEMORANDUM-DECISION AND ORDER

**I.       INTRODUCTION**

        This action arises from demolition of a multiple-family residential dwelling in the City of

Albany in September 2003 under the auspices of the City of Albany Building Code which

authorizes the Commissioner of Buildings in the City of Albany to order emergency demolition of

buildings deemed unsafe or unfit for human habitation.

**II.     FACTUAL AND PROCEDURAL BACKGROUND** [1]

On August 14, 2002, Albany Police Officer James Teller was called to assist the city's animal control unit with the removal of several dogs from an apartment at 141 Henry Johnson Boulevard, a three-family residential building in the City of Albany.  Two of the three apartments at the home were occupied by tenants.  At least two people lived on the second floor of the building along with the aforementioned dogs.  At least one gentlemen lived on the first floor and the basement apartment was vacant.  Officer Teller then requested the presence of defendant Captain Henry J. Abriel of the Albany Fire Department due to a "relatively severe condition inside" the building.  Officer Teller told Captain Abriel when he arrived at the scene that he had observed heavy maggot infestation and roach infestation inside the building and that the condition of the areas where the dogs were kept on the second floor resembled an "open air kennel."

Abriel thereafter personally inspected the building and observed the first floor ceiling "black with roaches."  Abriel also observed the following conditions inside the building at 141 Henry Johnson Boulevard: 1) roaches on the walls and cabinets of both the first and second floors; 2) "spongy" and in some cases totally deteriorated flooring with no linoleum or carpeting; 3) "raw" plywood or subflooring saturated with urine on top of floor joists; 4) flooring that "sagged" under Abriel's body weight on the second floor; 5) "piles of feces" throughout the rooms where the dogs were kept; 6) drains in the building that did not function; 7) 600-700 pounds of "stagnant," "standing water" in a cast iron tub due to the drain being in disrepair; 8)

---

[1]

At various points in setting forth the facts in this case, the parties refer to information contained in documents and reports which are unverified, unsworn and not in admissible form.  The Court has limited its recitation of the facts to those gleaned from deposition testimony or sworn affidavits from individuals with personal knowledge of facts attested to.

finished tiles on the floor in the bathroom in "bad shape;" 9) mice and rodents in the basement; and 8) garbage barrels in the basement with maggot infestations.  Abriel observed from the street that the exterior wall on the south side of the building "bowed" approximately four to six feet in the area where the bathrooms were located.  Additionally on the exterior of the building, Abriel observed that many of the window sills were rotting, and storm windows were "hanging off."  Abriel noted that "a lot" of the asphalt siding on the outside of the building was missing and "a lot" of the clapboards underneath it were missing and deteriorating.  According to Abriel, it was the worst vermin infestation he had ever seen.  He described the conditions at 141 Henry Johnson Boulevard as "deplorable."

After his initial inspection, Captain Abriel called defendant Robert C. Forezzi, Sr., Chief of the Albany Fire Department, as well as the County Health Department and Social Services, the Police Department and the Public Safety Commissioner, John Nielson.  Personnel from these offices were generally called in the case of unsafe or unfit living conditions discovered in the city and comprised what was known as the "Citizens Protective Team."  According to Abriel, as the original building inspector, it was his job to give team members a "general rundown" of conditions inside the building and then allow them to perform their own inspections.  To wit, Abriel stated: "Here's what we got, we have 10 dogs, police are confiscating the dogs, I have two elderly people on the first floor, three younger children on the second floor, go see what you think."[2]  According to Abriel, there were a number of police officers who walked through the building as well as personnel from the County Health Department, but "the two people from

---

[2]

Plaintiff testified at his deposition that there was only one gentleman living on the first floor and that the second floor apartment was occupied by a man, his girlfriend and "two dogs."  Although plaintiff believed the man's girlfriend had children, he said they did not live in the apartment.

3

Social Services were reluctant.  They wanted to put their tieback suits on first."  Abriel told them to "just take a quick peak," but "[a]fter their initial walk-through, the two Social Services representatives decided to stay outside and have [the tenants] come out to the front porch."

Chief Forezzi spoke briefly with Captain Abriel on the telephone prior to arriving at the scene.  Forezzi asked Avriel to tell him "how bad" the problems were at 141 Henry Johnson Boulevard "on a scale of 1 to 10 . . . and he said it's an 11."  Upon arriving, Chief Forezzi performed his own brief inspection of the premises.  Chief Forezzi observed a "wet," "sagging," "soft," and "sloping" floor "saturated" with urine in the top apartment.  The floor "sagg[ed" when Chief Forezzi stepped on it.  Chief Forezzi believed that the second floor was in "imminent danger" of collapsing or "pushing the wall out."  Further, Chief Forezzi believed that the second floor was a threat to the structural integrity of the entire building which he thought could possibly collapse.  Specifically, Chief Forezzi stated that "the floor was rotting and it was unsafe for somebody to live there and walk on that floor."  The Chief also observed garbage on the floor and roach and maggot infestation "throughout" the building, dead rats and mice, a bowed exterior wall, holes in the interior walls, a falling roof cornice and a "rotting," soft floor around the toilet in the bathroom that also had standing water in the tub.  Finally, Chief Forezzi noted that an electrical fire hazard existed in the building.  To wit, Forezzi observed extension cords running between apartments from one floor to another due to a lack of working electricity in some apartments.  It appeared that electricity was limited to the first floor apartment or possibly the basement.

Following his inspection, which he conceded lasted 15 minutes or less, Captain Abriel made a determination that 141 Henry Johnson Boulevard was an "unsafe" building, "unfit for habitability."  Captain Abriel conceded that he was not an engineer, but he received extensive

4

training as a firefighter, fire investigator and code inspector via the fire department.  In addition to his professional training, Captain Abriel testified that based on his "30 years of construction knowledge," 141 Henry Johnson Boulevard was "unrepairable."  Further, the vermin infestation was "so heavy," it was "probably not" possible to eradicate it.  Captain Abriel conceded during his deposition that "separately," the structural problems with the house "could have been repaired."  However, eliminating the infestation "probably would have destroyed the building" because "[t]hey would have probably had to remove all the walls and floors."  Abriel averred that "taken as a whole, with the whole structure into account, with the infestation on board, I mean, it was just a no win situation."  Captain Abriel recommended to Chief Forezzi that the building be demolished.

Chief Forezzi believed the building was an imminent danger to the building's occupants and the public at large.  He also said the building "could have been" in imminent danger of collapsing.  By "imminent," Chief Forezzi meant "there is a possibility that it's going to come down, that the public is in jeopardy."  Like Captain Abriel, Chief Forezzi conceded that he was not an engineer, but he had also received extensive training in building inspection and code enforcement through the fire department.  Forezzi consulted with Commissioner Nielsen, who had the ultimate authority of what to do with the building.  According to Forezzi, the "consensus" was to demolish the building.  Chief Forezzi believed that the decision to demolish the building was based on the "severity" of the "deplorable" conditions inside the building as well as its structural deficiencies.

Section 133-54 of the Code of the City of Albany captioned "Unsafe and unfit buildings" states:

>     The Commissioner [of Buildings] may determine that a building is

> unsafe by reason of the condition of the building or premises, including but not limited to structural instability in whole or in part, failure, inoperability or absence of adequate sanitary waste disposal, water supply, electrical, plumbing, heating and ventilating systems or facilities, vermin and insect infestation or unsanitary, dilapidated, decaying or overcrowded conditions.

Section 133-55 of the Code entitled "Power to act in emergencies" further provides:

> (A) Whenever the Commissioner finds that a violation of this Part 2 exists which, in his opinion, requires immediate action to abate a direct hazard or an immediate danger to the health, safety or welfare of the occupants of a building or of the public, the Commissioner may, without prior notice or hearing, take any action authorized herein which is reasonably necessary to abate or remove the condition.

> (B) Such action may include but is not limited to demolition of the building or structure, vacating the occupants of the premises and of surrounding premises, closing of public or private streets or rights-of-way, termination of utility service, erection of barricades and other protections and the performance of physical work on the premises.

§§ 133-54 and 133-55, Art. IX, Part 2, Chapter 133 of Part II of the Code of the City of Albany.

Once the decision to demolish the building was reached, Captain Abriel asked someone in his office to call the City's demolition contractors. Three demolition contractors arrived at the scene on the morning of August 14, 2002, performed individual inspections of the building and then prepared standard bid forms with the estimated cost of the proposed work. None of the contractors, including defendant DiTonno & Sons Demolition, took part in the decision to demolish the building, nor were they present when the decision to demolish the building was made. However, while preparing his company's bid to demolish the property, Dominic DiTonno did note that the back part of the house was "cobbed up," or "not put together too good." The City ultimately awarded the demolition job to, the DiTonnos, the lowest bidder. The DiTonnos based their bid on the amount of debris observed on the premises and the estimated cost of

hauling and disposing of it.[3]

The DiTonnos planned to demolish 145, 143 and 141 Henry Johnson Boulevard on August 14, 2002 in that order. They did not have a building permit to perform the emergency demolitions on that date, but they said it was typical for them to complete the building permit application after the emergency demolition occurred on oral orders from the City of Albany. The DiTonnos would then receive the official building permit along with payment from the City for the demolition job. The DiTonnos also had to wait for the tenants to vacate the buildings and the utilities inside to be shut off before beginning the demolition work. Somewhere between 5:00 and 6:00 p.m., after demolishing 145 Henry Johnson Boulevard, Dominic DiTonno recalled that Captain Abriel informed he and his brother that 143 Henry Johnson Boulevard was not going to be torn down. The brothers then commenced demolition of plaintiff's building. Dominic and Daniel DiTonno understood from what they were told by City officials that the reason that plaintiff's building was being demolished was because of an infestation of cockroaches and mice. At no time did either of the DiTonno's ever go inside 141 Henry Johnson Boulevard prior to performing the demolition due to the presence of an angry tenant who was breaking windows above their heads as they cased the outside of the building. Dominic DiTonno also stated they chose not to go into 141 Henry Johnson Boulevard after a police officer told them "that there was roaches falling on his shoulders while he was walking around" inside the building.

---

[3]

Three properties - 141, 143 and 145 Henry Johnson Boulevard - were scheduled to be demolished on August 14, 2002 based on the orders of Public Safety Commissioner Nielson. The owner of 145 Henry Johnson Boulevard was the County of Albany and consented to the demolition. The owner of 143 Henry Johnson Boulevard, which was in the process of being remodeled, convinced Commissioner Nielsen to save his property. The building was vacant, had no structural damage, other than to the back porch, no vermin infestations and was clearly being "rehabbed."

Dominic DiTonno remembered the infestation at 141 Henry Johnson Boulevard because he had never "seen a building yet that had that many roaches and mice in it."  Indeed, Dominic DiTonno averred "I mean, two days later still pulling debris out of the basement there still was roaches and mice running across the street."  During the demolition and debris removal process, both DiTonnos recalled that they flushed the walls of the restaurant next door with a fire hose because mice and roaches were coming out from under debris at 141 Henry Johnson Boulevard, crawling up the side of the restaurant and gathering under the eaves.  Daniel DiTonno described the escaping roaches as resembling a "swarm of bees."  According to Dominic DiTonno, there were also live roaches and mice in the rubble and in the trucks used to haul away debris.

Dominic DiTonno recalled that plaintiff arrived at the scene of the demolition with a gentleman but he "wasn't really listening to him . . . because usually on a job like that, if it isn't a city official . . . ordering me to do something different, we just are going to do the building."  Indeed, both DiTonnos concurred that during emergency demolitions, their only concern was completing the work as required by their bid.

There is no indication from the record that the City took steps to notify plaintiff of the proposed demolition of his building.  Plaintiff testified that he made weekly inspections of his building and the apartments inside.  He said he removed trash personally every week from the premises.  Plaintiff averred at his deposition that he had never seen a rat, mouse or maggot inside his building.  Plaintiff did state that he had "bombed" the building for cockroaches twice in the three months prior to the demolition.   Plaintiff stated that the only rats in the vicinity of his building were dead ones in the alley between 141 Henry Johnson Boulevard and the restaurant next door.  Plaintiff testified that he had installed new bedroom carpeting and new bathroom flooring in the upstairs apartment within six months of the demolition.  He stated that the flooring

in the rest of the apartment was of a hardwood construction and was in good repair.  Plaintiff did not recall any "bowed" walls or other structural issues existing inside his building.  Plaintiff had been in South Dakota since June 2002, however, and did not personally inspect his property or the inside of any of the apartments on the date of the demolition.

Plaintiff testified that at about 2:30 p.m. on August 14, 2002, he happened to be driving by his property to check on the tenants after his return from South Dakota when he observed DiTonno & Sons in front of the building and asked them what was going on.  When Dominic DiTonno told plaintiff that they were preparing to demolish three buildings, including 141 Henry Johnson Boulevard, plaintiff immediately called his attorney, Thomas Monjeau.  Mr. Monjeau's affidavit states that he received a telephone call from plaintiff at approximately 4:00 p.m. in the afternoon of August 14, 2002, who said that his building was about to be demolished.  Immediately upon hanging up the telephone with plaintiff, Mr. Monjeau tried to contact someone in the City of Albany Code Enforcement Office to no avail.  Following this attempt, Mr. Monjeau traveled to plaintiff's property where he encountered the DiTonnos who had already demolished 145 Henry Johnson Boulevard.  Mr. Monjeau said he had a conversation with "one of the partners of DiTonno & Sons Demolition" who told him they would not be demolishing plaintiff's building until the next morning.

Based on this alleged representation, Mr. Monjeau believed he had time to return to his office and prepare an Order to Show Cause to prevent demolition of the building.  However, minutes after returning to his office, plaintiff called Mr. Monjeau to say that demolition of his property had already begun.  When Mr. Monjeau arrived back at Mr. Smith's building, it was in the process of being demolished.  He noted that the DiTonnos were having "difficulty" tearing the building down because "[it] shook, but did not immediately fall down" when the demolition

9

equipment was hooked onto a window.  Mr. Monjeau also stated that during the time he spent at the property observing the demolition, he did not observe any vermin or insects.

Plaintiff alleges in his complaint that the ordinance under which the City ordered his property demolished is unconstitutionally vague and overbroad.  He also asserts that demolition of his building constituted an unlawful seizure within the meaning of the Fourth Amendment.  Further, plaintiff contends that he was denied due process of law under the Fifth Amendment and that defendants violated his Equal Protection Rights under the Fourteenth Amendment.  Finally, plaintiff asserts that the City, along with defendants Robert C. Forezzi, Sr., and Henry J. Abriel, both officers of the City of Albany Fire Department, conspired with defendant DiTtonno & Sons Demolition under 42 U.S.C. § 1983 to deprive him of his constitutional rights.  All defendants have moved for summary judgment on the ground that plaintiff has failed to meet his burden of proof in establishing any constitutional deprivation in this case.  Defendants Forezzi and Abriel also move for summary judgment on the basis of qualified immunity.  Plaintiff has cross-moved for summary judgment on all causes of action and on defendants' affirmative defense of qualified immunity.

**III.    DISCUSSION**

A.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.*  The moving party bears the initial burden of establishing that there is no genuine

10

issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e).  It is with these considerations in mind that the Court addresses the parties' motions for summary judgment.

B.    Facial Challenge to Constitutionality of Albany City Ordinance

The Court first address plaintiff's contention that the ordinance by which the City of Albany ordered demolition of his property is vague and overbroad and therefore unconstitutional on its face.  In *City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984), the Supreme Court stated that [t]here are two quite different ways in which a statute or ordinance may be considered invalid "on its face"-either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally "overbroad." *Id.* at 796.  In the first situation, "a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner." *Id.* at 797-798.  The other context in which a facial challenge may be permitted is where the statute "seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.' " *Vincent,* 466 U.S. at 796.  However, as the defendant City notes, the overbreadth doctrine is an exception carved out for cases involving First Amendment rights.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."). Thus, Count II of the complaint, which alleges that the ordinance is unconstitionally overbroad, must be dismissed.

11

With respect to Count I of the complaint, which claims the ordinance is unconstitutionally vague, a two-part test is used: a court must "first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and then consider whether the law 'provide[s] explicit standards for those who apply [it].' " *United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir. 1992) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (footnote omitted)), "Objections to vagueness ... rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).  An ordinance will survive a facial challenge as long as it is not "impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).  The Court is bound by precedent that prohibits declaring a statute or ordinance unconstitutional unless it is incapable of any valid application. *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Plaintiff's counsel contends "[i]t is not . . . plaintiff's burden to demonstrate that an emergency demolition is never appropriate."  Plaintiff could not be more wrong.  "A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987).  "Courts have often gone to great lengths to uphold a statute when there was even one set of circumstances in which it might be constitutional." *McKenzie v. City of Chicago*, 973 F.Supp. 815, 819 (N.D. Ill. 1997) (citing *Chemical Waste Management, Inc. v. United States Environmental Protection Agency*, 56 F.3d 1434, 1437 (D.C. Cir. 1995) (finding a regulation with serious and obvious problems not facially unconstitutional because those problems might not arise in one narrow set of circumstances)).

12

The ordinance at issue herein contains a list of conditions including "structural instability in whole or in part, failure, inoperability or absence of adequate sanitary waste disposal, water supply, electrical, plumbing, heating and ventilating systems or facilities, vermin and insect infestation or unsanitary, dilapidated, decaying or overcrowded conditions" which may warrant emergency demolition of a structure.  Contrary to plaintiff's assertions, the Court finds these standards sufficiently detailed to guide the exercise of administrative discretion.  Although the prohibited severity of the conditions warranting emergency demolition is not specified in the ordinance, it is apparent from the ordinance's title and purpose that the measure is whether these conditions render a building "unsafe" or "unfit."

As in *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972), we do not have here a statute which states simply that a building may be demolished if it is found to be unsafe or unfit. Rather, the City of Albany ordinance contains a list of prohibited conditions which are "easily measured," by their impact on the "direct" or "immediate" "health, safety or welfare " of the "occupants of a building or the public," both of whom are explicitly protected by the ordinance. *Id.*  Thus, the ordinance gives "fair notice to those to whom [it] is directed." *Id.*  Normally, "[a]n act will not be held invalid merely because it might have been more detailed in its provisions." *Whitfield v. Simpson*, 312 F.Supp. 889, 897 (E.D. Ill. 1970).  Rather, a court must construe a statute as compatible with the Constitution if it is reasonably possible to do so.  *See St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 780 (1981).

Importantly, plaintiff does not allege or present evidence that the City of Albany arbitrarily enforced the ordinance in question in other instances.  His conclusory assertions that the ordinance is subject to arbitrary and inconsistent application is not sufficient to establish that there are no circumstances in which the statute can be applied constitutionally.  The Court finds

it would be obvious to a person of ordinary intelligence that the ordinance in question prohibits

specific "unstable," "unsanitary," or "inadequate" housing conditions which present a hazard to

the immediate health, safety, or welfare of building residents or the public, his claim for

unconstitutional vagueness in Count I of the complaint must be dismissed.

C.      Deprivation of Constitutional Rights

        Plaintiff bases his constitutional claims on 42 U.S.C. § 1983, which reads in part:

> Every person who, under color of any statute, ordinance, regulation,
> custom or usage of any State ..., subjects or causes to be subjected,
> any citizen of the United States ... to the deprivation of any rights,
> privileges or immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action.

Plaintiff asserts five claims under 42 U.S.C. § 1983.  He claims that his rights under the Fourth,

Fifth and Fourteenth Amendments were violated by defendants "under color" of the City of

Albany ordinance which authorized demolition of his property.  Specifically, plaintiff alleges

that the demolition of the his property at 141 Henry Johnson Boulevard constituted an

unreasonable seizure of his property by defendants within the meaning of the Fourth

Amendment.  Plaintiff also asserts he was denied substantive and procedural due process under

the Fifth and Fourteenth Amendments when the City of Albany demolished his building without

providing him with notice or an opportunity to object.

1.      *Monell* Claim

        Plaintiff names the City of Albany directly as a defendant in his complaint.  For a valid

claim of municipal liability under § 1983 the municipality itself must be the wrongdoer rather

than one of its employees because § 1983 liability cannot be based on a respondeat superior

theory. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691-92 (1978).  A legally cognizable

claim of municipal liability under § 1983 must be based on an official municipal policy or

custom under which a constitutional violation was committed.  *Id*. at 689-91.

In one factual paragraph of the complaint, plaintiff asserts that the City was "deliberately indifferent to the training and supervision of defendants Forezzi and Abriel with respect to assuring that no violation of plaintiff's constitutional rights would occur or was deliberately indifferent to the need to adopt policies necessary to prevent constitutional violations." However, the complaint does not contain a separate cause of action detailing the City's alleged wrongdoing in this case.  The City is lumped together with the other named defendants who are said to have collectively violated his Fourth, Fifth and Fourteenth Amendment Rights.  Thus the complaint does not clearly set forth a distinct *Monell* claim in any of its seven counts.

Even overlooking the pleading defect, however, plaintiff has submitted no evidence in his moving or opposition papers to establish municipal liability in accordance with the well-established *Monell* standard.  A claim for failure to train or supervise will result in municipal liability only where the failure to train or supervise amounts to deliberate indifference to the rights of those with whom the state officials will come into contact.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). To support such a claim, a plaintiff must show:  (1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation;  (2) that the situation either presents the employee with a difficult choice of the type that training will make less difficult or that there is a history of employees mishandling the situation;  and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights. *Young,* 160 F.3d at 903-04; *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). No such evidence has been presented here.  Based thereupon, the *Monell* claim, to the extent

15

plaintiff may be said to have raised one, must be dismissed.

2.    Liability of the DiTonnos as State Actors

The DiTonno defendants argue that because they were merely carrying out a demolition order by the City of Albany, they were not state actors when they demolished the plaintiffs' home and that they are, thus, not liable for any constitutional deprivations under § 1983.  The correctness of this assertion by DiTonnos in connection with the claims for violation of plaintiff's Fourth, Fifth and Fourteenth Amendment rights, however, is unclear.

It is true that in order to state a claim under § 1983, a plaintiff must allege that he was injured by either a state actor or a private party acting under color of state law.  *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992).  "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'"  *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 941 F.2d 1292, 1295-96 (2d Cir. 1991) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).  However, in *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 620-21 (1991), the Supreme Court recognized as state action a private party's exercise of specifically delegated public sector authority.  Joint interference of state agents and private parties with private rights constitutes state action attributable to both public and private sector participants.  *See generally, e.g.*, *Soldal*, 506 U.S. at 60; *Georgia v. McCollum*, 505 U.S. 42, 53 (1992).

Moreover, in a separate § 1983 conspiracy claim, plaintiff alleges that the DiTonnos entered into and carried out an unlawful agreement with City officials to deprive him of constitutional rights.  A complaint which alleges that a private entity acted in concert with the

state actor to commit an unconstitutional act clearly contemplates state action.  *See Spear*, 954 F.2d at 68; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970) (actual conspiracy between state court and private party attempting plainly prohibited act would constitute "state action.").  Because plaintiff's § 1983 claims fail for reasons unrelated to the DiTonnos' status as state actors as discussed below, it is not necessary for the Court to decide whether they were acting under color of state law when they demolished plaintiff's building.

3.    Substantive Due Process

The remaining defendants assert that they are entitled to summary judgment on plaintiff's claim of violation of his substantive due process rights.  They are correct.  The Supreme Court, in *Albright v. Oliver*, 510 U.S. 266, 273 (1994), held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  In this case, there is an "explicit textual source of constitutional protection" on which plaintiff may and does rely---namely, the Fourth Amendment.  Simply put, the Fourth Amendment protects against "unreasonable searches and seizures" by the government. U.S. CONST. AMEND. IV.   A "seizure ··· occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' " *Soldal v. Cook County, Illinois*, 506 U.S. 56, 60 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  Although plaintiff does allege that defendants acted arbitrarily and oppressively in condemning and authorizing the demolition of his building, *see Crowley v. Courville*, 76 F.3d 47, 51 (2d Cir. 1996), his claim fits squarely within the contours of the Fourth Amendment's protections.  *See Soldal*, 506 U.S. at 61-62, *DeBari v. Town of Middleton* 9 F.

17

Supp.2d 156, 161 (N.D.N.Y. 1998).  Where, as here, the government demolishes a building, a "seizure" clearly results within the explicit meaning of the Fourth Amendment.  *See id.* Accordingly, because plaintiffs' claim is grounded in an explicit textual source, his substantive due process claim must be dismissed.

4.      <u>Unlawful Seizure Under the Fourth Amendment and Procedural Due Process</u>

Defendants do not argue that plaintiff's complaint fails to set forth legally cognizable claims under 42 U.S.C. § 1983 for alleged violations of plaintiff's rights under the Fourth Amendment and his due process rights under the Fifth and Fourteenth Amendments.  The basic legal standards applicable to plaintiff's claims are not contested between the parties.  Thus, for example, there is no serious dispute concerning whether demolition of plaintiff's property constitutes a "seizure" within the meaning of the Fourth Amendment or whether emergency demolition of a private citizen's property implicates procedural due process considerations under the Fifth and Fourteenth Amendments.  What defendants do argue, is that the facts demonstrate emergency demolition of plaintiff's property was necessary and reasonable due to the "deplorable" conditions inside the building which created untenable health and safety risks for the occupants of the building and the public at large.  Plaintiff, in turn, does not dispute that under any constitutional test, the legality of defendants' conduct in this case turns on its reasonableness and the existence of an alleged emergency.  *See, e.g., Soldal v. Cook County, Illinois*, 506 U.S. 56, 61-62 (1992) (whether the Fourth Amendment is violated depends on whether the seizure was "reasonable"); *Catanzaro v. Weiden*, 140 F.3d 91, 1998 WL 122393, at *2 (2d Cir. March 17, 1998) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981) ("It has long been recognized, however, that authorized agents may proceed without providing

18

pre-deprivation hearings when an emergency situation necessitates quick action or makes it impracticable to provide a meaningful hearing . . . "))

Defendants' deposition transcripts are replete with evidence that Captain Abriel and Chief Forezzi concurred in their assessment that the severe insect and vermin infestations in plaintiff's building on August 14, 2002, along with the building's apparent structural instability, warranted summary abatement of the property to avert a continuing health and safety concern for the public.  During his deposition, plaintiff denied that his building was ever in the state described by defendants, but he could not offer first-hand knowledge of the conditions inside the building at 141 Henry Johnson Boulevard or the apartments within on August 14, 2002, since he conceded he was in South Dakota for three months prior to the demolition.  However, plaintiff contends that he has created a question of fact as to whether emergency demolition of his property was necessary or reasonable based on "expert testimony" in the record.  Specifically, plaintiff contends that based on the reports of Michael Schafer, "a licensed structural engineer," who was present for the depositions of all defendants, and Dr. Russell Grow, "an expert entomologist," who reviewed defendants' deposition transcripts and exhibits, no emergency situation existed at his property.  Plaintiff's counsel has attached to his affidavit in opposition to defendants' motions reports from both of these experts.  Plaintiff's counsel argues that the report from Mr. Schafer establishes that there were no conditions which existed at plaintiff's building on the date in question which indicate "structural failings" of the structure.  Moreover, plaintiff's counsel asserts that Dr. Grow opined that there was no threat to the public based on the alleged infestation described by defendants at plaintiff's building.

Even assuming that these purported experts, who have no first hand knowledge of the

19

conditions which existed inside 141 Henry Johnson Boulevard on the date in question, were

qualified to opine on the reasonableness or necessity of defendants' actions, plaintiff's heavy

reliance on the Schafer and Grow reports to defeat defendants' motions is misplaced.  In stark

contrast to plaintiff's repeated assertions throughout his motion papers, there has been no "expert

testimony" presented by anyone in this case.  True, plaintiff has submitted expert reports, but

these are simply letters from two purported experts to his counsel setting forth their opinions

concerning the facts in this case.  These letters or reports are unsworn, unverified and not in

admissible form.  *See* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on

personal knowledge, shall set forth such facts as would be admissible in evidence, and shall

show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or

certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto

or served therewith.")  Consequently, plaintiff's "expert reports" do not establish **any** fact, much

less a question of **material** fact, precluding summary judgment in this case.  The only evidence

in admissible form which plaintiff has submitted in opposition to defendants' motions comes

from defendants' own deposition transcripts and an affidavit submitted by his counsel, Mr.

Monjeau.

   Plaintiff has essentially "cherry picked" the deposition transcripts of defendants Abriel

and Forezzi to contend that the defendants themselves conceded no emergency circumstances

existed on August 14, 2002, which would have required summary demolition of his property.

However the portions of the depositions relied on by plaintiff in support of his claim are

unavailing.  The Court addresses plaintiff's arguments *seriatim*.

   1) Defendants' decision to demolish plaintiff's building was a "quick determination" as

conceded by defendant Abriel.  The Court assumes the truth of this argument by plaintiff, but the speed with which defendants acted, standing alone, is irrelevant.  This is particularly true here where it is undisputed that several members of the "Citizens Protective Team" including representatives from the County Health Department and Social Services, the Police Department and the Public Safety Commissioner, John Nielson were called to the scene and were given time to arrive at the scene, inspect the property, and speak to tenants.  Despite the "quick" nature of the decision-making in this case, all public officials involved were in "consensus" regarding the proposed demolition.

2) Though Commissioner Nielson ultimately had the power to decide whether emergency demolition of plaintiff's building was appropriate, he received counsel from defendant Forezzi who admitted that he has never overruled the determination of a firefighter/inspector such as defendant Abriel concerning whether a building should be demolished.  Again, this may be a true statement of the facts in this case, but Forezzi never overruling the recommendation of a building inspector, in the absence of evidence demonstrating that building inspectors from the fire department are unqualified to make recommendations on demolition determinations, is irrelevant.  Further, as plaintiff concedes, it is the Public Safety Commissioner, not Chief Forezzi, who ultimately made the determination to demolish plaintiff's building.

3) Defendants Abriel and Forezzi were not qualified to assess the conditions inside plaintiff's building because they admitted they were not structural engineers.  In connection with this argument, plaintiff relies heavily on the court's determination in *Heidorf v. Town of Northumberland*, 985 F. Supp. 250 (N.D.N.Y. 1997).  There, on facts similar to those at bar, the court denied summary judgment to the municipal defendants, none of whom were structural

engineers, because of a question of fact concerning the necessity of emergency demolition. However, in *Heidorf*, plaintiff had submitted a sworn affidavit from a structural engineer who opined that emergency demolition was not necessary. *See* 985 F. Supp. at 258. Further, it was "undisputed" that the municipal decision-maker was "inexperienced" in making assessments in the area of emergency demolition. *Id.* The facts here are distinguishable. First, defendants Abriel and Forezzi had extensive training by the fire department in the area of building safety and inspection and both had significant building construction training and experience. Second, plaintiff has failed to submit any evidence in support of his arguments that the outcome in this case would have been different if the City used licensed engineers to make emergency demolition determinations or if he had been afforded the opportunity to consult with an engineer prior to his building being demolished. Further, plaintiff has failed to demonstrate that the status of Abriel and Forezzi as non-engineers had any impact on the lawfulness of their recommendation that his building be demolished. This is particularly true since here, it is undisputed that Commissioner Nielson, who was not sued by plaintiff and whose status as an engineer or non-engineer is not revealed in the record, made the final decision to demolish plaintiff's building.

　　4) Defendants were "ill-informed" as to the severity of the infestation inside plaintiff's building because defendant Abriel said he "[did] not know" if it would be possible to rid the building of its infestation. Later, in connection with a question regarding whether structural deficiencies inside the building could have been repaired, Abriel said "Could have been repaired, yes. It depends on how much you want to spend to make a building habitable. Like I say, I believe in this case, the money was better spent on demolition."

Even assuming the truth of plaintiff's premise that the infestation in this case could have been resolved, his claim that defendants acted unreasonably still fails.  Captain Abriel averred that the infestation was the "worst [he] had ever seen" and that the building was "not habitable." Moreover, according to Captain Abriel, the infestation was "so heavy" that eradication of it would have required removal of all the building's walls and floors.  Chief Forezzi stated that the "severity" of the conditions inside the building, including ceilings that were "black" with cockroaches, the presence of mice,  rats and maggots, "piles of dog feces," "soggy," "squishy," "sagging," urine-soaked flooring, and "stagnant" standing water in a tub due to lack of drainage along with the various structural problems, made the building an "imminent" danger to the building's occupants and the public at large.  Plaintiff made conclusory assertions in his deposition concerning conditions inside his building three months prior to the demolition, but has offered nothing to dispute defendants' testimony concerning what they observed inside the three-family dwelling on August 14, 2002.  Based upon the undisputed testimony of the defendants concerning the "deplorable" conditions inside 141 Henry Johnson Boulevard - which were characterized far and away by more than a cockroach/vermin infestation - the Court finds that the feasibility of eradicating the infestation is not dispositive of the reasonableness or necessity of demolition.

Plaintiff also asserts that Captain Abriel's comment concerning whether the building could have or should have been repaired represents evidence that he used an improper subjective cost/benefit test as the basis for his determination regarding emergency demolition.  This argument falls short on a number of grounds.  First, there is nothing in the transcript to suggest that this comment by defendant Abriel was the factual basis for his recommendation that the

building be demolished on August 14, 2002, rather than simply his after-the-fact considered opinion of the matter.  Second, there is no evidence that he shared this opinion with anyone else involved in the determination of whether to demolish plaintiff's building.  Since it is undisputed that Captain Abriel did not make the final determination to demolish plaintiff's building, his subjective thoughts are irrelevant.

    5) While the determination to demolish the building was being made, defendants allowed tenants to remain inside the building.  This undisputed fact, standing alone, is insufficient to bolster plaintiff's argument that no emergency existed with respect to the conditions inside his building.  There was no testimony by any witness concerning the reason why tenants were allowed to remain inside the building for an unspecified period of time while the demolition option was being considered, but what is clear is that authorities were obligated at the very least to ensure that these individuals had the opportunity to make emergency alternative living arrangements and remove their belongings from the apartments.

    6) Defendants Abriel and Forezzi conceded that they did not warn defendant DiTonno & Sons of any structural problems within plaintiff's building, nor did they advise the contractor of the insect and vermin infestation.  Again, in the absence of further context, this undisputed fact can be explained in several ways that do not support plaintiff's contention that no emergency existed on the date of the demolition.  It is undisputed that defendants Abriel and Forezzi did not consult with or involve the DiTonnos in any way with the decision of whether to demolish the building.  To wit, Dominic DiTonno stated "[n]ormally they [the City] just ask us to give an emergency demolition price and that's it.  We are not engineers so we don't look over the building to see if it is worth taking down.  If they ask us to take the buildings down, that's all we

do." Thus, it is unclear why the City's failure to inform the DiTonnos of conditions inside the building is relevant. The record is clear, however, that both of the DiTonnos personally observed and were aware of the cockroach and rodent infestation at plaintiff's building. Thus, plaintiff's reliance on the failure of defendants Abriel and Forezzi to inform the DiTonnos of it as proof that the infestation did not exist is unavailing. Further, it is undisputed that the DiTonnos did not enter the building at any time prior to the demolition, nor does the record indicate they were required to do so as part of the demolition process which was accomplished using equipment attached to the building's exterior.

7) Defendants did not utilize the standards set forth in the City's building code in their decision-making because in response to the question "Is there a list somewhere that sets forth all the criteria that would create an unfit or unsafe condition?" defendant Abriel said "I believe it is spelled out in the city code. I don't know whether we have a copy of that." The Court cannot agree with plaintiff that this statement on its own suggests or proves that at the time defendants made the recommendation to demolish plaintiff's building, they were literally not in possession of nor did they have access to the legal standards set forth in the City's building code. Without further context, it is just as likely that defendant Abriel meant that he and his fellow witnesses did not have a copy of the code with them at the deposition.

8) Plaintiff also suggests that defendant Forezzi admitted to the lack of objective standards used in making the demolition determination when, in response to the question "Is there a list of criteria that need (sic) to be met before demolition is authorized?" he testified, "No, not that I am aware of.." The Court notes that there is a stark difference between what defendants Abriel and Forezzi clearly did in this case, that is, used the list of objective criteria set

25

forth in the building code as a measure of whether a building is "unsafe" or "unfit," and compiling a required checklist of criteria prior to authorizing demolition as was suggested by this question.

9) Finally, plaintiff argues that defendants could not identify an imminent danger concerning the structural integrity of plaintiff's building because when asked if the building was in "imminent danger" of collapsing, defendant Forezzi stated "It could have been" and then added "You know, imminent, does that mean a minute from now or two minutes from now or a snowstorm?"  This argument is ineffectual since both defendants Abriel and Forezzi testified that though plaintiff's building clearly had structural deficiencies, the "primary" reason why plaintiff's building was demolished was the "health hazards" inside the apartments.

Insofar as the evidence submitted by plaintiff directly on the issue of whether emergency conditions existed which justified the summary destruction of his building, he offers the affidavit of his attorney who was at the scene of the demolition.  Mr. Monjeau avers first that "one of the partners" of DiTonno and Sons Demolition told him that plaintiff's building would be demolished on the morning of August 15, 2002.  It is undisputed that three buildings were originally slated to be demolished on August 14, 2002, that the three buildings were all in a row, that 145 Henry Johnson Boulevard was the first to be leveled and that plaintiff's building would have been last.  Because demolition of 145 Henry Johnson Boulevard did not begin until late in the afternoon of August 14, 2002, it is certainly possible that the original plan was to level the first two buildings on the 14th and wait until the following morning to take the third one down. The record is clear that the DiTonnos were asked to demolish three buildings and they planned to do just that.  There is no evidence that City officials were involved in deciding which building

26

should come down first or last.  Indeed, Dominic DiTonno testified "They [the City] would pretty much point out the house, have us look them over and we would be the one to decide how to take it down the best way without causing damage to the properties next door."  In the absence of contrary evidence, it appears that the details of the demolition were left to the DiTonnos, "the demolition experts."  Thus, the Court cannot conclude that no emergency condition existed at plaintiff's building based on the original demolition plan contemplated by the DiTonnos.

Mr. Monjeau also states in his affidavit that at no time during the various periods in which he was outside plaintiff's building on the date of the demolition did he observe any "vermin or insects" which conflicts directly with the DiTonnos' testimony concerning "swarms" of cockroaches and rodents running from the building and rubble.  This conflict, however, is wholly immaterial however, since it was the conditions inside the building which indisputably led to the decision to demolish the building.  Finally, Mr. Monjeau's observation that the DiTonnos "appeared to be having difficulty in pulling the building down," is likewise in conflict with the DiTonnos' direct testimony on this issue.  Again, however, the conflict is irrelevant since the undisputed primary factor in defendants' determination to demolish the building was not its structural deficiencies, but rather, the "deplorable" conditions and infestations inside the building which rendered it uninhabitable.

Plaintiff has failed to raise any material issue of fact to contradict overwhelming evidence in the record which demonstrates that defendants Abriel and Forezzi observed hazardous and unsanitary conditions inside 141 Henry Johnson Boulevard, and that their recommendation that the building be demolished was based on the reasonable assessment that these conditions rendered the building "unsafe and/or unfit" and subject to emergency

demolition as authorized by the City's building code.  Based thereupon, plaintiff's claims of unreasonable seizure and denial of procedural due process pursuant to the Fourth, Fifth and Fourteenth Amendments must be dismissed.[4]

5.    Denial of Equal Protection

Plaintiff also claims that his equal protection rights were violated under the Fourteenth Amendment because other landlords in the City of Albany were afforded the opportunity to abate "similar conditions" at their properties while plaintiff's building was summarily demolished.  The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).  Selective enforcement is a "murky corner of equal protection law in which there are surprisingly few cases." *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir. 1980).  To sustain such a claim, a plaintiff must present sufficient evidence for a reasonable inference to be drawn that 1) compared with others similarly situated, plaintiff was selectively treated; and 2) that such selective treatment was based on impermissible

---

4

The Court notes that the same analysis would render a fatal blow to plaintiff's substantive due process claim even if the Court were to consider this cause of action on its merits.  To prove denial of substantive due process, a plaintiff must establish that in depriving him of a property interest, a defendant acted in an arbitrary or oppressive manner.  *See Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 102 (2d Cir. 1992), *cert. denied*, 507 U.S. 987 (1993).  Even viewing the evidence in the light most favorable to plaintiff and accepting his conclusory argument that the defendants' determination to demolish his building was ill-informed, hasty, and unreasonable, his substantive due process claim still fails.  "Substantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against a government action that is 'incorrect or ill-advised.' " *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995).  On the present record, no jury could reasonably conclude that defendants' decision was arbitrary or irrational, or that it shocks the conscience.  Accordingly, plaintiff's substance due process claim is without merit if not already barred by his corresponding Fourth Amendment cause of action.

28

considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure plaintiff. *Id.* at 609.   A plaintiff has an equal protection claim actionable under Section 1983 if he proves that defendant(s) "employed their official powers for the purpose of injuring [him], rather than to serve the proper ends of their government duties." *Id.* at 610 (citations omitted).

At best, plaintiff demonstrated through the depositions of defendants Abriel and Forezzi that at various points prior to the demolition of plaintiff's building, City officials had encountered other buildings with structural problems and/or infestations of insects  and rodents and decided to either destroy the buildings or allow the owners to make repairs based on factors unique to each case.  Absent from the record in this case is any evidence that persons similarly situated to plaintiff were treated differently by defendants.  A further and more glaring omission in the record is evidence that defendants were motivated by malicious intent, bad faith, race or other impermissible discrimination in recommending demolition of plaintiff's building. Plaintiff's conclusory claim that he was "treated differently does not, in itself, show malice." *Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir. 1995) (citing *LeClair*, 627 F.2d at 610). Moreover, a plaintiff cannot establish an equal protection violation based on "selective enforcement" simply by showing that a regulation or policy was not enforced against others similarly situated. *Id*.; *see also*, *Puglisi v. Underhill Park Taxpayer Assoc.*, 947 F.Supp. 673, 705 (S.D.N.Y. 1996).  "After all, 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation,' as long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *LeClair*, 627 F.2d at 611 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).  Based thereupon, plaintiff's

equal protection claim is subject to dismissal.

6.   Qualified Immunity

Defendants claim that regardless of the sufficiency of plaintiff's claims regarding the demolition of his building, they should not be found liable for alleged violation of his constitutional rights because they are shielded by qualified immunity.  "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Yet, even if the rights in question are clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991); *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990).

Again, defendants do not dispute the applicability of the Fourth, Fifth and Fourteenth Amendments to their determination to summarily demolish plaintiff's building.  The question is whether the normal substantive and procedural protections afforded by these Amendments were properly ignored in this instance by defendants.  Thus, resolution of the qualified immunity question again turns on whether it was objectively reasonable for the defendants to believe that an emergency existed with respect to the conditions inside plaintiff's building.

Because of the undisputed facts already discussed above, the Court concludes that it was objectively reasonable for defendants Abriel and Forezzi to view the situation in this case as an acute potential health and safety hazard for the residents of plaintiff's building and the public at large.  Thus, it was objectively reasonable for defendants Abriel and Forezzi to believe that their

actions were appropriate under the emergency demolition authorization set forth in the City of Albany building code and were thus not violative of plaintiff's constitutional rights. *See Waldron v. Rotzler*, 862 F.Supp. 763, 772 (N.D.N.Y. 1994) (city officials entitled to qualified immunity after demolition of plaintiff's building without notice and opportunity to be heard). To the extent that plaintiff argues that the emergency demolition provision in the City's building code is facially unconstitutional, the Court has already dismissed said claim. Such an allegation does not, in any event, sway the Court's opinion that the conduct of defendants Abriel and Forezzi was objectively reasonable under the Fourth, Fifth and Fourteenth Amendments. Based on this record, a rational jury could not conclude that it was objectively unreasonable for these defendants to believe that in ordering the demolition of plaintiff's indisputably filthy, rat, maggot and cockroach infested building, which tenants were using as an "open air kennel," they were acting in a fashion that violated plaintiff's constitutional rights. *See Williams v. Greifinger*, 97 F.3d 699, 707 (2d Cir. 1996); *Waldron*, 862 F.Supp. at 772 (undisputed facts concerning defendant's observations and conduct compelled finding of objective reasonableness).

The question remains, however, whether the DiTonnos, to the extent they may be deemed state actors, are entitled to qualified immunity. It is undisputed that the DiTonnos took no part in the decision to demolish plaintiff's building. Nothing in the record indicates that the DiTonnos, in following the directives of City officials, acted in a manner which was objectively unreasonable. There is no evidence that the DiTonnos were even aware of the alleged shortcomings and/or deficiencies in the City officials decision-making process set forth in plaintiff's complaint. Based upon these facts, the Court concludes that it was objectively reasonable for the DiTonnos to believe that, in carrying out the order to demolish plaintiff's

building, they were not violating plaintiff's constitutional rights.   Therefore, even if they are

deemed state actors or private parties acting in concert with state actors, the DiTonnos are

entitled to qualified immunity.  Thus, even if plaintiff's § 1983 claims against defendants are not

subject to dismissal on their merits, defendants are entitled to qualified immunity.

D.     Conspiracy Under 42 U.S.C. § 1983

Finally, plaintiff asserts that defendants conspired under 42 U.S.C. § 1983 to deprive him

of his constitutional rights.  To sustain this claim, plaintiff must show: 1) an agreement existed

between Abriel, Forezzi, and DiTonno & Sons Demolition; 2) to act in concert to inflict

constitutional injury upon plaintiff; and 3) that defendants committed an overt act in furtherance

of said conspiracy which caused damages.  *See Ciambriello v. County of Nassau*, 292 F.3d 307,

323 (2d Cir. 2002).  Furthermore, to prove the required "element of combination, plaintiff[] must

show that the conspirators had a meeting of the minds and thus reached an understanding to

achieve the conspiracy's objectives."  *Weissman v. Fruchtman*, 1986 WL 15669, *4 (S.D.N.Y.

Oct. 31, 1986) (citations omitted).  A merely conclusory allegation that a private entity acted in

concert with a state actor does not suffice to state a § 1983 claim against the private entity.  *See*

*Spear*, 954 F.2d at 68. "Conclusory, vague, or general allegations that the defendants have

engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly

dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific

instances of misconduct.*" Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)

(citations, internal quotation marks, and internal alterations omitted).

Absent from plaintiff's complaint are any factual allegations suggesting that the

DiTonnos conspired with City officials to violate his constitutional rights.  *See e.g., Hughes v.*

32

*Patrolmen's Benevolent Ass'n of the City of N.Y., Inc*., 850 F.2d 876, 880-81 (2d Cir. 1988) (holding that complaint alleged sufficient facts to support conclusion that private-actor PBA had acted under color of state law, where complaint alleged, *inter alia*, that PBA had hired private investigators and placed plaintiff under surveillance with knowledge and consent of state-actor New York City Police Department).   Moreover, in opposing defendants' motions, plaintiff has submitted no evidence that defendants Abriel and Forezzi conspired with each other or that either of them conspired with the DiTonnos.   Thus, plaintiff has not even alleged, much less demonstrated, the required "meeting of the minds" as between defendants.

The most damaging argument raised by plaintiff in connection with the conspiracy claim is that "one of the partners of DiTonno & Sons Demolition" allegedly misled his attorney concerning the planned time of the demolition.   First of all, this allegation is wholly conclusory since it is not attributed to an identified person.   Secondly, even if the Court overlooks this deficiency and assumes that "one of" the DiTonnos attempted to mislead plaintiff's counsel concerning the time of the demolition so as to prevent him from filing a legal action to stop it, there is no indication that anyone from the City was involved in the attempt to mislead.   Finally, there is no indication from the record that this statement, assuming it was made by one of the DiTonnos, was an attempt to mislead anyone.   As already discussed above, there were originally three buildings scheduled for demolition on August 14, 2002.   Since demolition of the first building did not begin until late in the afternoon and plaintiff's building was indisputably third on the list, it is entirely possible that the DiTonnos believed at some point on August 14, 2002, that they would not get demolition of plaintiff's building underway until the next morning. Based thereupon, plaintiff's conspiracy claim under 42 U.S.C. § 1983 must be dismissed.

**IV.     CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that plaintiff's motion for summary judgment is DENIED; and it is further

ORDERED that the motions by defendants for summary judgment are GRANTED; and it is further

ORDERED that plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

Dated: March 27, 2006
        Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge